JOHNSON

*v.*

PHILADELPHIA, B. & W.R. Co.

(Court of Chancery of Delaware.   Nov. 6, 1905.)

*Saulsbury, Ponder & Curtis,* for complainant. *Ward & Gray,* for respondent.

NICHOLSON, Chancellor: The bill in this cause was filed August 31, 1905, and the answer September 11, 1905, at the hearing of a motion for a preliminary injunction on bill, answer, affidavits, and exhibits. The hearing began September 11th and ended September 16th. The case is one of a number brought by abutting property owners against the Philadelphia, Baltimore & Washington Railroad Company for the purpose of preventing the elevation of the railroad tracks upon the railroad's right of way between West and Justison Streets, in the city of Wilmington, or the condemnation of the properties adjoining the railroad's right of way on the north. This is the second of such suits to be heard on motion for a preliminary injunction; decisions having been rendered and opinions filed in the other suit on two several motions. *Daniel Bubenzer v. P.B. & W. Railroad Co., (Del.Ch.)* 57 *Atl.* 242, and *Id. (Del.Ch.)* 61 *Atl.* 270. The complainant in this suit has presented essentially the same case as did the complainant in the *Bubenzer* suit, with the exception of the evidence adduced in relation to his claim of a right of way, and more specially as to the existence of a public street (Water Street) over that portion of the railroad's property or right of way between West and Justison Streets. The case presented by the respondent, however, is radically different. At the hearing of the first motion for a preliminary injunction in the *Bubenzer* suit, there was no denial by the respondent of the allegations in complainant's bill, supported by a number of affidavits, in relation to his alleged easement of a right of way; and the preliminary injunction was granted expressly because of the implied admission of all the plaintiff's allegations by such failure to deny. The question of the right of way is referred to in the opinion delivered by this court upon the decision of the second motion (that made upon the amended pleadings sub-

sequent to the condemnation proceedings) as follows: "And in respect to the original right of way above described, the respondent alleges in his answer to the amended bill that the condemnation proceedings concerning all that portion of complainant's property abutting upon the respondent's right of way have destroyed the easement and right of way alleged by the complainant over the respondent's present right of way, or the alleged bed of Water Street, and that the destruction of said alleged easement or right of egress and ingress was considered by the said commission is assessing their damages for the condemnation of said property." *Bubenzer v. P., B. & W.R. Co.,* (*Del.Ch.*) 61 *Atl.* 272. After the decision of that motion, affidavits and plots and photographs relating to a longitudinal right of way alongside the railroad tracks, to and from the property of complainant, were presented at Chambers by the respondent's solicitors, and from these were formulated the terms of the order actually signed. In the present case, however, a great number of affidavits are introduced, denying any adverse user of a way either across or alongside the tracks of the railroad, respondent, although the answer alleges, as did the answer in the *Bubenzer* case, above cited, "that the destruction of said alleged easement or right of egress and ingress was considered by the commissioners in assessing their damages for the condemnation of said property." The most vital difference, however, between the case presented by respondent in this suit and that presented by it in the *Bubenzer* suit consists in the respondent's treatment of the alleged fact which constituted the crucial point of the decision in the suit brought by Daniel Bubenzer, and the ground upon which that decision rested exclusively. I refer to the alleged fact of the existence of an outbuilding of the value of $300 upon the premises sought to be condemned. The respondent did not deny that there was an outbuilding on Bubenzer's property of the value of $300 or upwards, and that circumstance alone brought the Bubenzer property within the restriction of respondent's power of condemnation contained in the charter of the Wilmington & Susquehanna Railroad Company, viz.: "That it shall not pass through any burying ground or place of public worship, nor any dwelling house without the consent of the owner thereof, nor shall it pass through any outbuilding of the value of three hundred dollars without such

consent." In the case before me, however, this vital allegation of the complainant is denied, both in the answer and by affidavits, and as, according to the principles laid down in the *Bubenzer* suit, the complainant's case must rest ultimately upon his proof of this alleged fact, it would seem proper that this should be the first point considered.

The complainant's allegation upon this point in the first paragraph of his bill is as follows: "And on Water Street, in which respondent's tracks are now laid, a stable opening upon said Water Street, which stable has been in use, with egress and ingress by, through, and upon Water Street, where said tracks are laid, certainly for fifty years, which said stable is of the value of more than three hundred dollars, to wit, the value of one thousand dollars." The respondent answers this allegation as follows: "And respondent further denies that there is any stable or other building or outbuilding of any kind upon the rear portion of said lot, described as No. 1, which portion of said lot was condemned by commissioners on petition of the said respondent railroad company, in accordance with the forms of law and of the statutes of the state of Delaware in such cases made and provided, of the value of three hundred dollars or upwards." The complainant supports this allegation of his bill by his own affidavit, as follows: "The stable on the easterly of two properties in which he is interested is of great value to the place as a licensed house, and has been regularly rented, when not used by the properties, for as much as five dollars a month, though sometimes for three dollars per month." There is but one affidavit corroborating or supporting in any way this allegation. That affidavit is made by William M. Connelly, the present building inspector of the city of Wilmington, and gives no estimate whatever of value. Mr. Connelly estimates what it would cost to construct an equivalent building, but significantly refrains from giving his estimate of the value of the present building. I will give his affidavit in full: "My name is William M. Connelly, and I am building inspector of the city of Wilmington, Dela. On Thursday, the 14th day of September, A.D. 1905, I visited the locality known to me for thirty years as Water Street, west of West Street, where the southerly ends of the

properties fronting on Front Street west of West Street abut. I made an examination of the stable on the rear end of the Johnson property, for the purpose of determining what it would cost to place a building there to answer the same purpose for which this is fitted. The building is, of course, weather beaten, but a little pointing up of bricks and some paint would cause it to make a very different appearance. It would not be possible to erect an equivalent building there for less than $450 to $500. The building as it stands is sound, and answers all the purposes a new one would be of the same size and character."

The railroad company, respondent, has filed in support of its answer the affidavits of eight experts. One of these, John J. Cassidy, alleges that he was building inspector of the city of Wilmington for six years, from 1898 to 1904, and that he had never had his attention called to the building erected in the rear of certain properties between West Street and the Harlan & Hollingsworth Company's old foundry, abutting on the Philadelphia, Baltimore & Washington land, until recently. He then says: "I have also carefully inspected the said buildings as to their values, and beginning at West Street, on going westward, I would value the buildings upon said properties as follows: The stable upon the rear of the property of Ellen Johnson, known as 402 West Front St., I would consider a value of one hundred and fifty dollars a liberal estimate therefor. The stable of Daniel Bubenzer, upon the rear of one of his properties, facing on Front Street, I would consider seventy dollars as a liberal figure for its value"—and so on through the properties abutting on the space in dispute. The seven other affidavits are by prominent contractors and builders of the city of Wilmington, who testify that they have examined carefully the properties described by Mr. Cassidy, and four of them pronounce the buildings absolutely valueless, remarking that the estimate of value made by John J. Cassidy is very liberal. The other affiants simply aver that none of buildings referred to are of the value of $300. That there is an outbuilding on the property condemned of the value of $300 must, of course, be proved affirmatively by the complainant, in order to entitle him to the protection given by the charter restriction of the railroad company's power to

condemn, and enable him to invoke the aid of the strong arm of the Court of Chancery. It cannot be held that he has succeeded in doing this, for the allegation in the bill to that effect is fully met by the denial in the answer, and the affidavit of the complainant himself, instead of strengthening, rather weakens, the simple allegation he has made in his bill, inasmuch as he indicates that he bases his estimate of value upon rents received at some past time, no rent at all being alleged as of the present time, and on some fancied peculiar value given to a stable by being owned in connection with a licensed saloon —a value which is not measured or accounted for. The affidavit of Mr. Connelly, as I have noted above, contains no estimate of value whatever, and it must assuredly be admitted that the cost of erecting a new building in the place of the old one, "of course, weather beaten," "which while it stands answers the purpose," cannot be taken as a measure of the value of the present building in the proceedings before me. The question is not what it would cost to construct a new building on the site of the old one, but what is the value of the present building.

The conclusion is inevitable, from the principles laid down in the *Bubenzer* case, that, the complainant having failed to establish this ground for exempting his property from condemnation, the motion for a preliminary injunction must be dismissed, without regard to any of the other questions raised; provided, only, that the railroad company, respondent, can be shown to have taken the pains to proceed correctly in the condemnation of complainant's property. If the land of complainant has been lawfully condemned, the alleged easement of a right of way goes with it. It would also follow that the complainant, being no longer an abutting land owner, in consequence of the condemnation, would have no standing in this court to raise the question of the extension of Water Street over that portion of the railroad's right of way west of West Street.

The general corporation law contains the provisions which authorize and regulate the respondent's right of condemnation. It appears from these provisions that these condemnation proceedings are based upon a resolution of the board of directors (section 82, c. 394, p. 794, vol. 22, *Del. Laws*) which provides that "it shall also be

lawful for any railroad company in this state * * * to straighten, widen and otherwise improve the whole or portions of its line or lines of railroad * * * in such manner and to such extent as its board of directors may determine upon, whenever, in the opinion of such board the same may be necessary, * * * and to acquire all lands and material necessary therefor by agreement with the owner or owners, or on failure to so agree, in the manner and by the proceedings prescribed in section 81 of this act." In section 81 it is provided: "That whenever any corporation created under this act cannot agree with the owner or owners of any lands, sand, * * * necessary to be taken and used in the construction of said railroad, for the purchase thereof, the said corporation may apply to the associate judge of the state of Delaware resident in the county where the land and material necessary to be taken are located," etc. Then follow the provisions relating to the appointment of freeholders, notice, etc., the assessment of damages which "the owner or owners will sustain by reason of the said railroad passing through, taking and using the same," and, finally, after prescribing how payments shall be made, etc., it concludes: "Whereupon the said corporation shall be entitled to have, hold, use and enjoy the said lands, premises and materials described and condemned in said report and required for the purposes of said corporation, for or on account of which said damages shall have been so assessed." The prerequisite resolution was duly passed by the board of directors, resolving that it was necessary, etc., to acquire the tract of land marked 3 on the plans submitted to the board, and describing No. 3 as follows: "A piece of land, with improvements thereon, having a width of forty feet, and extending from West Street to Justison Street, along the northeasterly side of the Philadelphia, Baltimore & Washington Railroad." A strip 40 feet in width was thus authorized to be condemned, and therefore the first step was taken, in accordance with the law as construed in the *Bubenzer* case, above referred to; but an examination of the proceedings following the said resolution of said board shows a fatal variance. The report of the commissioners states that they did go upon and assess the damages on land of the defendant $41\frac{2}{10}$ feet in width at its widest part, and the plot of the land belonging to complainant, which was sought to be condemned, which plot has been submitted by respondent's solicitors since the hearing

of the motion, shows a strip of land $41\frac{2}{10}$ feet in width, in harmony with the report, and it is not denied that that is the width of the strip which they proceeded to condemn; the same description of the strip appearing throughout in other papers. The authority upon which depended the whole proceeding of condemnation formally declared 40 feet to be the width of the strip to be condemned, thus at once creating and limiting the power to take. The commissioners, on the other hand, totally disregarding their mandate, proceeded to take a strip exceeding that width by one foot and two-tenths of a foot.

Nothing has been suggested by counsel, nor have I been able to discover anything, which could give me the authority to alter or amend the condemnation proceedings, or in any way avoid the conclusion that all the proceedings subsequent to the resolution of the board of directors were fatally defective and void. Respondent's solicitors have submitted an affidavit by one of the railroad engineers, which gives the reasons or motives which induced the variation; but unfortunately the motives, however excellent cannot alter its legal effect. It appears to be clear, therefore, that although the respondent had the power to condemn the property in dispute in accordance with the provisions of the general corporation law, yet it is equally clear that it has failed so to do.

This conclusion brings me to the consideration of that question for the solution of which counsel in the cause have expended an amount of labor, which, if I may judge by its results, is almost unprecedented in this court. The question to which I refer is whether Water Street extends west of West Street, over the lines claimed by the railroad company, respondent. Beginning as far back as 1801, statutes, ordinances, debates, and proceedings in council, plots, maps, resolutions of committees, reports of condemnation proceedings, abstracts of title and affidavits without number, as well as letters and propositions from railroad officials, were produced at the hearing, and consumed in the reading nearly a whole week. In order to be certain that I had overlooked nothing, and to be able properly to co-ordinate and arrange in my mind this vast mass of material, I have gone over it all again very carefully at my desk, and over many portions again and again. If, taking it all together, anything affirmative could be ex-

tracted from the miscellaneous aggregate of papers, it would be proper for me to review and tabulate it thoroughly, even though it might occupy the space of a whole volume of law reports. Such is not the case, however. The conclusions to be drawn from it are purely negative, and my decision must be based upon what it fails to prove, rather than what it does prove; upon what does not appear, rather than what does appear. I shall therefore be very brief and very general in my view of it. The industry and research displayed in the collection of this material entitle counsel to commendation, and its results, which will be preserved in the office of the register in chancery. will doubtless prove of inestimable value to the local historian.

, Proof of the Rumford title to the land in dispute was introduced by the respondent and abstracts of title of the abutting owners; also, an agreement between Jonathan Rumford and the Wilmington & Susquehanna Railroad Company, dated April 1, 1835, by which Jonathan Rumford agreed to convey to the railroad company, and "to make a good title in fee simple" to as much of his land "as shall be required by the said act of incorporation for the purposes of the said railroad," for the sum of $400. This was followed by Rumford's receipt for $400, and written promise to give a deed for the land whenever required by the company. The company went into possession under this agreement, and counsel claim a fee-simple title to the land, and not a mere right of way.

It will be entirely useless for me to cite the numerous acts and ordinances concerning Water Street, because they have not been shown to have resulted in its opening between West and Justison, nor is there the slightest scintilla of evidence in writing that it was ever condemned. Condemnation proceedings were had throughout the year 1872, which finally resulted in the opening of a street 25 feet wide, called "Railroad Avenue," along the south side of the track of the respondent company, west of West Street. These proceedings were based upon a statute directing, and followed by a city election and numerous meetings of the city council showing discordant views, all resulting in condemnation proceedings, which finally ended, after many checks and delays, in the opening of a street 25 feet wide on the southerly side of and immediately adjoining, the tracks of the respond-

ent company. All this was set forth in detail, even to the amount of damages paid to each person entitled, and the exact description of every piece of property condemned. There are also affidavits as to the thoroughness of the search for documents and the ransacking of the city archives, which aver, in conclusion, that there is no evidence of the legal taking for a public street of any portion of the land used by the respondent company west of West Street.

Upon the question of common report and long user showing dedication, many affidavits were produced by the complainant to the effect that the railroad tracks west of West Street were considered to be laid on the bed of Water Street, and that every one used the space south of the properties above described, and between West and Justison Street, as a public highway, believing it to be Water Street. In reply to this, however, the respondent introduced affidavits by the score contradicting these affidavits in every particular, and the affidavits introduced by the respondent were not only three or four times as numerous as those introduced by the complainant, but were made by the prominent manufacturers and business men of the city of Wilmington whose places of business were in the neighborhood of the property in dispute. Finally, the complainant introduced certified copies of city maps from the municipal offices, showing Water Street extending beyond West Street; but in reply to this it was pointed out by counsel for respondent that the Water Street shown upon the said maps was a continuation in a straight line of Water Street to the east, so that, as the railroad's right of way curved to the south at the block in dispute, the Water Street shown upon the maps introduced by complainant would pass through the properties of the complainants in the above-mentioned suits against the railroad, rather than over the tracks of the railroad. Only one map has been shown by complainant that represents Water Street as extending beyond West, and at the same time curving southward in conformity with the curve of the railroad. This map is in an atlas published in 1876, under the direction of one G. M. Hopkins, of 320 Walnut Street, Philadelphia, as appears from the title page. It is manifestly a commercial enterprise, and the fact that Water Street is indicated by it upon the land in dispute would not, of course, carry enough weight as evidence to

justify this court in holding that such additional evidence proved the existence of Water Street in the locality indicated.

The condemnation proceedings which I have referred to as going on during nearly the whole of the year 1872 did actually result, as I have already indicated, in the opening of Railroad Avenue south of the respondent's right of way, hinging with it west of West Street. A map maker, from a casual glance at those proceedings, in the absence of the exhaustive examination of them and other records and proceedings that has been made in this cause, might easily infer that Water Street was extended with Railroad Avenue.

The labor and research expended upon this branch of the case have shown laxity, confusion, and carelessness on the part of nearly every one concerned in past years, but it fails to disclose evidence that the land into the possession of which the railroad company, respondent, or its predecessor went under the agreement with Jonathan Rumford was ever subjected to the easement of a public highway, and became a public street of the city of Wilmington. I am therefore brought, after the long and arduous labors which this branch of the subject has cost me, as well as the counsel in the cause, to the same conclusion which I announunced upon the decision of the first motion in the *Bubenzer* case, viz.: "The complainant failed to sustain the contention that the land southwardly of his premises is an extension of Water Street, and therefore a public highway."

The grounds upon which the complainant based his objection to the condemnation proceedings in the *Bubenzer* case are stated on page 271 of 61 *Atl.,* as follows: "(1) The respondent has no authority to construct an elevated railroad. (2) The respondent has no authority to widen its roadbed at the points in question, having already reached the extreme width authorized by the act under which it was created. (3) The respondent has no right to take for its use or destroy or pass through any outbuildings of the complainant of the value of three hundred dollars without his consent, by reason of the provision in the original charter of the Wilmington & Susquehanna Railroad Company, which provides that it 'shall not pass through any burying ground or place of public worship, nor any dwelling house without

the consent of the owner thereof, nor shall it pass through any outbuilding of the value of three hundred dollars without such consent.' (4) The respondent has no authority to take the land in question because of certain irregularities claimed to exist in the condemnation proceedings, which are elaborately set forth in the bill." The complainant repeats all these grounds of objection in the present case. Two of them (the third and fourth) have been hereinbefore considered at length, and the two remaining ones (the first and second) were decided adversely in the *Bubenzer* case for reasons fully set forth in the opinion of the Chancellor, and they must, for the same reasons, be decided in like manner in the case before me.

There is but one question, therefore, still to be discussed, and that is whether the complainant is entitled to an easement of a right of way obtained by user, and, if so, what way. It having been shown above that the condemnation proceedings taken by respondent were fatally defective, it follows that the complainant's motion for a preliminary injunction must be granted so far as to restrain the railroad company, respondent, from entering upon or taking the premises sought to be condemned. It also follows that, if there be an easement of a right of way attached to the said Johnson property, it should be protected by an injunction.

The complainant claims a longitudinal right of way alongside of the railroad tracks to West street for both of his abutting properties, and also claims a right of way across the railroad tracks for the property upon which there is a rear entrance to his saloon. The failure of proof as to this latter claim is complete. In fact, the affidavits submitted on this point seem to have been intended to support two different contentions, and they appear to be relevant to the claim of an indefinite roving use of the respondent's railroad track as a public highway or city street, rather than to the claim of user of a specific way to the rear entrance of complainant's property.

There are 52 affidavits, all in the following form: "That he knows the saloon kept by Arthur Johnson on Front Street or Lancaster Avenue in the city of Wilmington, just west of West Street, with a back entrance thereto from Water Street, and that he has more or

less frequently, from time to time, as he has found convenient and desirable, crossed over the ground on which the railroad tracks of the defendant are laid on what is called 'Water Street' west of West Street from the direction of the premises of the Harlan & Hollingsworth Company, and entered the premises of Arthur Johnson by his back gate on Water Street, which is such entrance, to transact such business there as he desired. This the deponent has done for about ——years." They differ only in the number of years of user. These vary from a couple of years upward, there being seven which allege twenty years or more, and some which state "about twenty years," the others stating much less. It is manifest without discussion that such evidence is utterly insufficient to establish a right of way appurtenant to the Johnson property across the respondent railroad's tracks. For that purpose, it is not entitled to receive serious consideration.

The longitudinal right of way, however, rests upon a great mass of testimony connected generally with the rear entrances to nearly all of the abutting properties in the block, but is contradicted by a very large number of affidavits introduced by the respondent in reply to the complainant's affidavits, and denying that the user was adverse. I will not discuss now the effect of the allegations of the respondent's answer in regard to the condemnation of this alleged easement of the right of way, nor will I revert again to the position taken by the respondent through its counsel in relation to the alleged easement of the same way in the *Bubenzer* case; but I will confine myself to the consideration of the very interesting and important question of law raised in the brief of respondent's counsel. This point is, as decided by some of the cases cited by him, that a longitudinal right of way along the right of way of a railroad cannot be granted by the railroad company, and therefore such easement cannot be acquired by user which presumes a grant. In the case which it has been necessary for me to cite so often—the *Bubenzer* case (*Del.Ch.*) 57 Atl. 243—the Chancellor says: "The argument in that case and in the cases cited in the opinion does not apply to the decidedly different questions that are raised by the claim of a right of way by prescription over a railroad's right of way; and it is interesting to note that in the state of Massachusetts,

where the right to obtain by prescription the easement of a private right of way over a railroad's right of way is established beyond question, the law is by statute precisely the same as that laid down in the California case above quoted, with regard to obtaining title by adverse possession to a portion of a railroad's right of way. *Turner v. Fitchburg Railroad Co.,* 145 *Mass.* 433, 14 *N.E.* 627, and *Fitchburg Railroad Co. v. Frost,* 147 *Mass.* 118, 16 *N.E.* 773. In *Turner v. Fitchburg Railroad Co.,* above cited, the court said: 'In *Fisher v. N.Y. & N.E. Railroad,* 135 *Mass.* 107, it was held that the statute of 1861, p. 413, c. 100 (*Pub. St.* 1882, c. 112, § 215), which, in substance, provides that no length of possession or occupancy of land of a railroad corporation by an abutter shall create a right in such land to the abutter, would not prevent him acquiring a right to a private way across the railroad by a twenty years user thereof.' The court further says: 'The defendant further urges that it is impossible to gain the right of way over a railroad in actual operation, as the land of the railroad would be subject to the easement of the plaintiff, who might make use of it at his own pleasure. The case does not require us to define the exact limits of the right which the plaintiff has acquired, but it does not follow that, even if he has an easement, it is not one which he is compelled to exercise subject to the superior right of the railroad corporation to run its trains as it may determine to be proper for the general business of its road. There certainly may be an easement which will permit a way to be used only at particular times or seasons or for particular purposes. As there may be by grant a "right to cross a railroad when the trains of the corporation are not passing, so such a right may be acquired." ' On the one hand, the failure of the respondent to deny, either by answer or affidavit, the allegations of the bill and accompanying affidavits with reference to the easement of a private right of way, operates as an admission of the user of such right of way in the manner and for the period (much exceeding twenty years) alleged; and, on the other hand, the admission at the hearing by the respondent that the elevated structure contemplated would block absolutely all ingress and egress to and from complainant's premises operates to eliminate from this case questions relating to the extent to which difficulties of crossing respondent's right of way might be increased, or opportunities for so doing de-

creased, under conditions suggested by the language of the learned Massachusetts judge, above quoted." And the Chancellor concludes as follows : "In view of all the considerations which I have thus briefly adduced, it only remains for me to say that the complainant has shown that he possesses an easement for ingress and egress to and from the premises described in the bill over and across the railroad's right of way southwardly of .his said premises, and that it follows that the company, respondent, should be restrained by a preliminary injunction from erecting any permanent structure that would obstruct, in the way contemplated by it, the complainant's enjoyment of his easement of such right of way. The motion for a preliminary injunction is therefore granted in so far as it seeks to restrain the respondent from obstructing or interfering with the enjoyment by the complainant of his private right of way over the respondent's right of way, southwardly of complainant's premises, by any structure or obstacle of a permanent character."

It is true that the order for the injunction issued after the decision of the second motion in that case protected a longitudinal right of way; but such modification of the original injunction granted in the case quoted just above was made upon the application of the respondent's solicitors after the decision of the second motion, and at a hearing granted them on the extent and form of the order to be signed, complainant's solicitors being also present. A moment's reflection will show that although, as stated in the Massachusetts case above cited, "there may be by grant a right to cross a railroad when the trains of the corporation are not passing," yet a right to use a railroad's right of way longitudinally is totally different. The first is, in fact, only a form of the familiar grade crossing, but from the very nature of things the use of the track or right of way of any railroad longitudinally cannot be subordinate to its use by the railroad, nor consistent with such use; and yet that is the postulate upon which rests the decision of the Massachusetts court which I have followed, to wit, that the easement of a railroad crossing exists sub modo, and is subordinate to the railroad's legitimate use of its right of way, dangerous and undesirable as such crossings are under the present conditions of railroading.

It is self-evident that the use of a longitudinal way along the right of way of a railroad company, except for an extremely short distance, is absolutely inconsistent with its proper use by the railroad company, and is subversive of such use. The question is discussed at some length in the case of *Sapp et ux. v. Northern Central Railway Co.,* 51 *Md.* 124. The court says: "It appears from the facts stated that the easement set up is that of a private footway for some considerable distance over the lands of a railroad corporation, alongside of or between the tracks of the road from the house of the plaintiffs to a public highway. Without stopping now to consider other essentials of an easement by prescription, it is familiar and elementary law that title by prescription is founded on the presumption of a grant, and it follows from this that, in order to establish a prescriptive right, it must be claimed under and through some one who had a right to grant or create the easement claimed. Washb. on Easements, 120. That a railroad corporation has no power or right to grant an easement like this of footways for persons to walk along their tracks or by the side of them seems an almost self-evident proposition. It is obvious that, if such power existed and were exercised, it would be subversive of the very purposes for which railroad charters are granted. But the principle, if it needed authority for its support, has been decided. Thus, where a company was authorized by act of Parliament to construct and operate a canal for public use, and the defendant erected a milldam and steam engine upon its banks, and drew water therefrom for operating the same, and to an action for doing this pleaded a prescriptive right so to use the water, the court held that such right could not be maintained, for it implied an original grant thereof by the company to him, and they had no right to make any such grant, or to use the water for any purpose except for that of a canal." The court cite and quote from *Rockdale Canal Co. v. Radcliffe,* 83 *Eng. C.L. Reports,* 287, and also *Staffordshire Canal v. Birmingham Canal, Law Reports,* 1 *Eng. & Irish Appeals,* 254, and add: "We have been referred to no authority and have found none in which the doctrine of those decisions have been controverted." These English canal cases cited contain, of course, many elements not existing in a railroad case, but the same line of reasoning seems to apply, and it compels assent to

the proposition that a longitudinal right of way along the right of way of a railroad not owning the soil cannot be created by such railroad by grant or otherwise, and cannot be acquired by user adverse to the railroad. How, indeed, can a railroad corporation, possessing only a right of way for railroad purposes, grant a right of way for purposes inconsistent with, and subversive of, their own use of it as a railroad? And, as stated by the court in the Maryland case, "it is familiar and elementary law" that title by prescription is founded on the presumption of a grant, and it follows from this "that, in order to establish a prescriptive right, it must be claimed under and through some one who had a right to grant or create the easement claimed."

The only question arising in the application of this reasoning to the case before me arises from the question of title. Counsel for the respondent have claimed throughout the argument that the railroad company, respondent, has an estate in fee simple in the land over which the easement of a right of way is claimed, and not a mere right of way over the land. If such be the case, the question arises whether the railroad company, respondent, as owner in fee, might not have the right to grant or create the easement, notwithstanding the fact that it is a corporation created for the purpose of conducting the business of a railroad company. This claim of title, however, made by the respondent's solicitors, has been emphatically denied during the argument of the pending motion by the complainant's solicitors, although it has not been a material issue in the cause, and assuredly it has not been so established as to become the basis of any affirmative action.

In view of all the considerations which I have adduced in reviewing the confused and complicated matters presented for my determination upon the pending motion, and also in view of the fact that one of the fundamental rules controlling the action of a court of equity in granting or refusing an injunction is that the protection of the writ must be actually, and not theoretically, needed in order to justify the granting of it, I am led to the conclusion that the motion for a preliminary injunction ought to be denied so far as it concerns the alleged easement of a right of way, which is the same way that the railroad company, respondent, is already enjoined from encroach-

ing upon or interfering with by the injunction outstanding in the *Bubenzer* case.

For the reasons hereinbefore given at length, the motion for a preliminary injunction is granted only so far as to restrain the railroad company, respondent, and its agents from entering upon or taking the land described in the condemnation proceedings which have been hereinbefore referred to.

Let the order be entered accordingly.